Case No. 4:17-cv-03567

In the United States District Court for the Southern
District of Texas, Houston Division

---

In re Garrison Municipal Partners, L.P., *Debtor*.

Don & Kay Green, *Appellants*.

---

On appeal from the United States Bankruptcy Court for
the Southern District of Texas, Houston Division

Case No. 14-32867

---

## Appellant Brief of Don & Kay Green

---

Reese Baker
Baker & Associates
Texas State Bar No. 01587700
950 Echo Lane, Suite 200
Houston, Texas 77024
(713) 979-2279
Fax: (713) 869-9100
Email: courtdocs@bakerassociates.net

COUNSEL FOR APPELLANTS DON & KAY GREEN

# Table of Contents

Table of Contents ................................................................................................2

Table of Authorities .............................................................................................4

Jurisdictional Statement .......................................................................................6

Issue Presented .....................................................................................................7

Statement of the Case ...........................................................................................8

    A.    Relevant Facts ...........................................................................................8

    B.    Procedural History ..................................................................................10

Summary of the Argument..................................................................................11

Argument.............................................................................................................14

    A.    Background and Policy Rationales of Section 510(b) ..............................14

    B.    Redemption Claims Do Not Satisfy the Policy Rationales Underlying Section 510(b) ........................................................................................15

    C.    Redemption Claims Are Not "Attempting to Recover an Equity Investment" ...............................................................................................19

    D.    The Greens' Claim Is a Redemption Claim ...............................................26

    E.    The Trustee and Bankruptcy Court Did Not Distinguish the Greens' Claim from a Redemption Claim on Any Meaningful Basis....................27

    F.    The *TriStar* and *Marine Holdings* Cases Are Not Persuasive ..................39

Conclusion ..........................................................................................................44

Certificate of Service ................................................................45

Certificate of Compliance with Rule 8015(a)(7)(B)................................................45

## Table of Authorities

### Cases

*Burtch v. Gannon (In re Cybersight LLC)*,
  2004 WL 2713098, 2004 U.S. Dist. LEXIS 24426
  (D. Del. Nov. 17, 2004) ............................................................................ passim

*Hohn v. United States*,
  524 U.S. 236 (1998) ............................................................................................43

*In re Blondheim Real Estate, Inc.*,
  91 B.R. 639 (Bankr. D.N.H. 1988) ....................................................................14

*In re Terry Flores*,
  32 B.R. 455 (Bankr. S.D. Tex. 1983) .................................................................28

*In re Wyeth Co.*,
  134 B.R. 920 (Bankr. W.D. Mo. 1991)................................................................14

*McCutcheon v. FEC*,
  134 S. Ct. 1434 (2014) .......................................................................................43

*Montgomery Ward Holding Corp. v. Schoeberl*
  *(In re Montgomery Ward Holding Corp.)*,
  272 B.R. 836 (Bankr. D. Del. 2001) ................................................ 16, 21, 31, 42

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
  361 B.R. 369 (Bankr. S.D.N.Y. 2007)............................................. 16, 21, 40, 42

*Official Comm. of Unsecured Creditors v. Am. Capital Fin. Servs.*
  *(In re Mobile Tool Int'l, Inc.)*,
  306 B.R. 778 (Bankr. D. Del. 2004) ........................................................... passim

*Official Comm. of Unsecured Creditors v. FLI Deep Marine LLC*
  *(In re Deep Marine Holdings, Inc.)*,
  2011 WL 160595, 2011 Bankr. LEXIS 579
  (Bankr. S.D. Tex. Jan. 19, 2011) ............................................................... passim

*Pensco Trust Co. v. Tristar Esperanza Props., LLC*
  *(In re Tristar Esperanza Props., LLC)*,
  782 F.3d 492 (9th Cir. 2015)........................................................................ 39, 40

*Pepper v. Litton*,
  308 U.S. 295 (1939) ..........................................................................................28

*SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*,
  579 F.3d 411 (5th Cir. 2009)................................................................. passim

*Templeton v. O'Cheskey (In re American Housing Foundation)*,
  785 F.3d 143 (5th Cir. 2015)................................................................. passim

## Statutes

11 U.S.C. § 510(b) ................................................................................ passim

28 U.S.C. § 1334(b) ...........................................................................................6

28 U.S.C. § 157(a) ..............................................................................................6

28 U.S.C. § 157(b) ..............................................................................................6

28 U.S.C. § 157(b)(2)(B) ....................................................................................6

28 U.S.C. § 157(b)(2)(O) ...................................................................................6

28 U.S.C. § 158(a)(1) ..........................................................................................6

## Rules

Federal Rule of Bankruptcy Procedure 8002 ............................................6

## Jurisdictional Statement

This matter concerns the subordination under 11 U.S.C. § 510(b) of a claim asserted by the Greens against the bankruptcy estate. The bankruptcy court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(b). It was a core proceeding in the bankruptcy court under 28 U.S.C. § 157(b), including subsections (2)(B) and (2)(O), because it concerns the allowance or disallowance of claims against the bankruptcy estate and adjustment of the debtor-creditor or equity security holder relationship.

The Greens appeal the Bankruptcy Court's Memorandum Opinion and Order on October 31, 2017 regarding the subordination of their claim. The district court has jurisdiction over this appeal under 28 U.S.C. § 158(a)(1) because the Bankruptcy Court's Memorandum Opinion and Order on October 31, 2017 is a final order. The appeal is timely because the Greens filed their Notice of Appeal on November 10, 2017,[1] within the time prescribed by Federal Rule of Bankruptcy Procedure 8002.

---

[1]    ROA(I).020 (Docket); ROA(I).312 (Notice of Appeal). The Record on Appeal is in two parts. This brief will refer to the main document at Doc. No. 6 in this case as ROA(I) and to the attachment to Doc. No. 6 in this case as ROA(II).

---

**Issue Presented**

The Fifth Circuit has explained that, in a bankruptcy case, 11 U.S.C. § 510(b)[2] does not subordinate claims for the redemption of an ownership interest in the debtor. This is because, after redemption, the former holder of an equity interest no longer participates in the risks and rewards of holding equity. When the Greens withdrew their investment from Garrison, they no longer shared in Garrison's income, gains, and losses. Should the Court subordinate their claim under Section 510(b)?

The Court should review the Bankruptcy Court's findings of fact for clear error and its conclusions of law de novo.[3] The issue presented is an issue of law and should be reviewed de novo.

---

[2]     Subsequent references to "Section" will refer to Title 11 of the United States Code, unless otherwise specified.

[3]     *Templeton v. O'Cheskey (In re American Housing Foundation)*, 785 F.3d 143, 151-52 (5th Cir. 2015).

## Statement of the Case

### A.    Relevant Facts

The Greens contributed $1.9 M in 2008 to the Garrison Municipal Partners, LP ("Garrison"), the debtor in this bankruptcy case, in exchange for a limited partnership interest in the Garrison.[4] Garrison's Limited Partnership Agreement (the "Partnership Agreement") gives the limited partners the right to "voluntarily withdraw all or part of his Limited Partnership Interest in the Partnership as of the close of business on the last day of each Fiscal Quarter."[5]

The Greens exercised this right on November 13, 2013 by giving written notice to Garrison of their intent to withdraw.[6] Pursuant to the terms of the Partnership Agreement, their withdrawal became effective "as of the close of business on the last day of [the] Fiscal Quarter," *i.e.* on December 31, 2013.[7]

Although the Partnership Agreement did not provide for Garrison to pay the Greens' withdrawal amount immediately upon withdrawal, it did expressly provide that "[a] withdrawing Partner does not share in the income, gains and losses of the Partnership or have any other rights as a Partner after the effective date of its

---

[4]    ROA(II).0006 (Proof of Claim).

[5]    ROA(I).256 (Partnership Agreement ¶ 5.5(b)).

[6]    ROA(II).0007 (Proof of Claim).

[7]    ROA(I).256 (Partnership Agreement ¶ 5.5(b)).

withdrawal."[8] Furthermore, the Partnership Agreement did not permit Garrison to withhold payment of the withdrawal amount indefinitely. Even if Garrison elected not to pay the withdrawal amount immediately, it still was contractually obligated to pay 100% of the withdrawal amount promptly following completion of the financial audit for the fiscal year of the withdrawal date.[9] Therefore, as of December 31, 2013, the Greens no longer participated in the income, gains, and losses of Garrison; Garrison owed them payment of their withdrawal amount of $1,969,297.65;[10] and Garrison was contractually obligated to pay them that amount promptly following the 2013 financial audit.

Garrison did not pay the Greens any of the withdrawal amount[11] and it filed for Chapter 7 bankruptcy on May 22, 2014.[12]

---

[8]   ROA(I).259 (Partnership Agreement ¶ 5.5(k)). This provision is subject to limitations that no party has argued are applicable to this case and which are not applicable.

[9]   ROA(I).257 (Partnership Agreement ¶ 5.5(e)).

[10]   ROA(II).0001 (Proof of Claim); ROA(II).0006 (Proof of Claim).

[11]   ROA(I).305 (Opinion).

[12]   ROA(I).002 (Docket).

**B.      Procedural History**

On August 21, 2014, the Greens filed a proof of claim in Garrison's bankruptcy case asserting the $1,969,297.65 owed to them as a general unsecured debt.[13]

On June 12, 2017, the chapter 7 bankruptcy trustee (the "Trustee") filed an Omnibus Objection to Proofs of Claim Filed by Limited Partners of Garrison Municipal Partners, L.P. (the "Omnibus Objection").[14] The Omnibus Objection includes an objection to the Greens' claim asserting that their claim should be subordinated to other general unsecured claims pursuant to Section 510(b).

The Greens contested the Trustee's objection on the grounds that their claim is not subject to subordination under Section 510(b).[15] The Bankruptcy Court ruled against the Greens and in favor of the Trustee on this issue in its Memorandum Opinion and Order of October 31, 2017 (the "Opinion").[16] It is this order which the Greens now appeal.

---

[13]   ROA(II).0001 (Proof of Claim).

[14]   ROA(I).017 (Docket); ROA(I).052 (Omnibus Objection).

[15]   ROA(I).137 (Green Response to Trustee's Omnibus Objection); ROA(I).147 (Green Brief Regarding Mandatory Subordination).

[16]   ROA(I).302 (Opinion).

## Summary of the Argument

In *SeaQuest Diving, LP v. S&J Diving, Inc.*, the Fifth Circuit explained that a claim for the redemption of a security interest is not subject to subordination under Section 510(b).[17] This is because the act of redeeming the security interest converts the claimant's equity position into a debt position.[18] The Greens' claim does not differ any material respect from the redemption claims discussed in *SeaQuest* because they also converted their equity position to a debt position before Garrison filed for bankruptcy. By the express terms of the Partnership Agreement, they were no longer able to participate in Garrison's gains and losses after the effective date of their withdrawal.[19]

The policy rationales underlying Section 510(b) do not apply to the Greens' claim any more than they applied to the redemption claims discussed in *SeaQuest*. This is because the Greens are not seeking to undo the bargain that they made as equity investors and because their equity investment was fully at risk throughout the period of investment. It thus functioned throughout that time as an equity cushion for creditors. Finally, because the Greens' claim does not seek to obtain any loss in value that occurred to their investment while they were equity owners,

---

[17]   *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 422-23 (5th Cir. 2009).

[18]   *Id.*

[19]   ROA(I).259 (Partnership Agreement ¶ 5.5(k)).

---

the claim does not seek to recover or recoup their equity investment, which is the most important policy rationale to consider in determining whether or not a claim is subject to Section 510(b).[20]

The Trustee and the Bankruptcy Court attempted to distinguish the Greens' claim from the redemption claims discussed in *SeaQuest* because Garrison never issued the Greens a separate promissory note and because the Greens' withdrawal right is not contained in an agreement separate from the Partnership Agreement.[21] But the Fifth Circuit required neither of these things for a claim to qualify as a redemption and the Court should not adopt these distinctions as meaningful because they have nothing to do with the substantive, economic differences between a redemption claim on the one hand and claims that would be subject to subordination under Section 510(b) on the other.

The Bankruptcy Court also distinguished the Greens' claim on the basis that the Partnership Agreement still required action by Garrison to repay the withdrawal amount, but this distinction is irrelevant because the Partnership Agreement only permitted Garrison to delay repayment, not refuse payment altogether. Because the Greens, as of their withdrawal date, had an absolute legal

---

[20]   *Id.* at 421 ("the fact that the claims in the case seek to recover a portion of the claimants' equity investment is the most important policy rationale.").

[21]   ROA(I).306 (Opinion); ROA(I).203 (Trustee's Reply to the Greens' Response).

right to eventual payment—though no later than promptly after the 2013 financial audit—their claim required no more additional action from Garrison than any other debt claim that has not yet come due.

## Argument

### A.    Background and Policy Rationales of Section 510(b)

Section 510(b) subordinates certain claims that are technically classified as

debt to all other debt claims. Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from
> rescission of a purchase or sale of a security of the debtor or of an
> affiliate of the debtor, for damages arising from the purchase or sale
> of such a security, or for reimbursement or contribution allowed under
> section 502 on account of such a claim, shall be subordinated to all
> claims or interests that are senior to or equal the claim or interest
> represented by such security, except that if such security is common
> stock, such claim has the same priority as common stock.

Congress enacted Section 510(b) to allocate the risk of fraud in the purchase

of an equity interest to the person buying the equity interest.[22] For example, if a

person purchased an equity interest in the debtor and then later accused the debtor

of fraud in connection with the purchase, the purchaser would technically have a

general unsecured claim against the debtor in bankruptcy. Without Section 510(b),

the purchaser would collect on the fraud claim on an equal basis with other

unsecured creditors. But because of Section 510(b), the purchaser is paid only after

the other general unsecured creditors. The risk of fraud in the purchase of an equity

---

[22] *In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988); *In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991).

interest is thus allocated to the purchaser and the other equity holders, rather than to the general unsecured creditors.

Congress allocated this risk to the purchaser for two reasons. The first reason is that the purchaser bargained for an equity position in the debtor.[23] An equity position gives the purchaser the opportunity to share in potentially unlimited future growth in exchange for the risk of losing its capital investments.[24] In comparison, general unsecured creditors receive only the repayment of a fixed debt.[25] The second reason is that the purchaser's risk of losing its investment creates an equity cushion that creditors rely on when they choose to extend credit to the debtor.[26] For these two reasons, creditors should generally be subject to less risk than persons who have attempted to invest in the debtor.

**B.     Redemption Claims Do Not Satisfy the Policy Rationales Underlying Section 510(b)**

Notwithstanding these two reasons, it is not the case that once a person bargains for an equity position, it is forever locked into that bargain. In *SeaQuest*, the Fifth Circuit recognized that the act of redeeming equity for debt before the

---

[23]   *SeaQuest*, 579 F.3d at 420.

[24]   *Id.*

[25]   *Id.*

[26]   *Id.*

---

bankruptcy filing converts "the 'risk/return position of an equity investor' to a 'fixed, pre-petition debt due and owing' the claimant as a creditor."[27] For this reason, neither Section 510(b) nor the policy rationales underlying Section 510(b) apply to claims for the redemption of a security interest.[28] The Fifth Circuit cited several cases from other jurisdictions in support of its observation: *In re Montgomery Ward Holding Corp.*;[29] *In re Mobile Tool Int'l, Inc.*;[30] *In re Marketxt Holdings Corp.*;[31] and *In re Cybersight*.[32,33] It noted that "the claimants, pre-petition, were no longer able to participate in the benefits and risks associated with being equity holders of the debtor."[34]

The Fifth Circuit's observation clearly relates to the first policy rationale underlying Section 510(b), namely that the risk/reward profile of an equity investor differs from that of a creditor, but the observation also relates to the second policy

---

[27]   *SeaQuest*, 579 F.3d at 422-23.

[28]   *Id.* at 422-23.

[29]   *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836 (Bankr. D. Del. 2001).

[30]   *Official Comm. of Unsecured Creditors v. Am. Capital Fin. Servs. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778 (Bankr. D. Del. 2004).

[31]   *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007).

[32]   *Burtch v. Gannon (In re Cybersight LLC)*, 2004 WL 2713098, 2004 U.S. Dist. LEXIS 24426 (D. Del. Nov. 17, 2004).

[33]   *SeaQuest*, 579 F.3d at 423.

[34]   *Id.* (quoting *Cybersight*).

rationale, which relates to the investment's function as an equity cushion. When an equity investor redeems a security interest, the redemption does not undo or eliminate the function that the investment served as an equity cushion for creditors. To illustrate, assume an investor contributed $100,000 to an entity for a 25% ownership interest and the entity had $400,000 in total assets. Assume that creditors, seeing that the entity had $400,000 in total assets, lent $300,000 to the entity, which the entity spent immediately. Assume that the investor then redeems his ownership interest. Since the entity now has $300,000 in liabilities, the net value of the entity is now only $100,000 and the investor's ownership interest has only one quarter of its original value. The investor thus has a redemption claim for only $25,000, not $100,000. Because the equity investment was actually subject to the risk of loss, the investor lost any claim for $75,000 of his investment. The $100,000 served as the equity cushion on which the entity's creditors relied and the investor lost $75,000 as a result.[35]

Contrast this example to a rescission, which is specifically subject to mandatory subordination under Section 510(b). Suppose again that the investor had contributed $100,000 to an entity for a 25% ownership interest, that the entity had

---

[35] Furthermore, creditors cannot reasonably have relied on an assumption that equity investors would never redeem their investments since the information disclosing this possibility is in the entity's governing document and available for creditors to request at the time of lending.

$400,000 in total assets, and that creditors lent $300,000 to the entity, which the entity spent immediately. But now suppose that instead of redeeming his ownership interest, the investor discovers that the entity defrauded him into purchasing the ownership interest and he demands rescission of the interest. By seeking to rescind the purchase, he seeks to undo the original transaction as if it had never taken place.[36] Therefore, the investor's claim is for the full original investment of $100,000. Because the investor has a claim for the full amount of his original investment regardless of any loss the entity has incurred during the period of investment, the investment has not served as an equity cushion and it may have misled the entity's creditors into believing that the entity had more assets than it did. The same analysis would also apply if, instead of rescinding the investment, the investor sought damages that would recoup to him the original investment, e.g. tort damages for fraud or contractual damages for a guaranty in the amount of the original investment.[37]

The Fifth Circuit recognized that redeeming an equity interest does not eliminate the function that the investor's capital contribution served as an equity cushion for creditors. Contrasting a redemption with the transaction actually at

---

[36] *SeaQuest*, 579 F.3d at 419.

[37] This is what occurred in *Templeton v. O'Cheskey (In re Am. Hous. Found.), 785 F.3d 143 (5th Cir. 2015)*. The subordinated claim in that case was based on guaranty agreements with the debtor.

issue in the case, it stated in *SeaQuest*: "If the transaction was structured as a redemption…then the claims of all unsecured creditors (including [the claimant]) would be satisfied from the 'equity cushion' provided by [the claimant's] capital contributions."[38] Though the court ultimately held that the transaction at issue in that case was a rescission subject to mandatory subordination rather than a redemption, had the transaction been a redemption, the claimant would have shared in the debtor's assets on an equal basis with other general unsecured creditors and its capital contributions would nevertheless have served their equity cushion function.

## C.   Redemption Claims Are Not "Attempting to Recover an Equity Investment"

This distinction between redemption claims and rescission or rescission-like claims ultimately gets at what the Fifth Circuit means when it says that a claim is "attempting to recover or recoup a portion of the equity investment."[39] This is because the understanding of this phrase that best fits the case law and the policy rationales underlying Section 510(b) is that a claim is attempting to recover a portion of the equity investment when it seeks to regain a loss in value that occurred to the equity investment at the start of or during the period of investment.

---

[38]    *SeaQuest*, 579 F.3d at 424.

[39]    *Id.* at 421; *Templeton*, 785 F.3d at 155.

Beginning with the basics, the word "recover" suggests that a person is seeking to regain something that has been lost. It has been defined as "[t]o get back or regain *in full* or in equivalence"[40] and "recovery" has been defined as "[t]he regaining or restoration of something lost or taken away."[41] "Recoup" also has this sense and is defined as "to get an equivalent for (losses): make up for."[42] Applied to an equity investment, the most natural understanding of a loss that one might attempt to regain is a loss in the value of the equity investment that occurred at the start of or throughout the duration of the investment. The amount invested, although paid over to the entity, would not ordinarily be considered a "loss" until the security has actually experienced a decline in value. For example, if a person's equity investment has doubled in value and the entity then purchases the investment for its value, the person thereby receives back the amount paid over to the entity, but hardly anyone would consider it regaining a "loss."

The phrase "recovery of an equity investment" should incorporate this concept of loss because although it is undoubtedly true that—if interpreted very broadly—it could include any sort of claim that seeks to cash out an equity investment, such a broad interpretation is not warranted by the context in which the

---

[40]  *Black's Law Dictionary* 1302 (8th ed. 2004)(emphasis added).

[41]  *Id.*

[42]  https://www.merriam-webster.com/dictionary/recoup (last visited May 11, 2018).

Fifth Circuit used it. Whatever it means to "recover a portion of the equity investment," the meaning cannot be so broad that it would encompass merely redeeming an equity interest, as the claimants did in *Montgomery Ward*, *Mobile Tool*, *MarketXT*, and *Cybersight*. This is because when the Fifth Circuit first articulated that recovering a portion of the equity investment was the most important policy rationale to consider,[43] it did so in the very same case that it recognized that the redemption claims in those cases were not subject to mandatory subordination.

Thus, the meaning of this phrase that makes sense in the context of *SeaQuest* is not the broadest possible meaning, but one that incorporates the sense of loss contained in the definitions of "recover" and "recoup." Attempting to "recover a portion of the equity investment" means that the claimant is attempting to regain a loss in the value of the equity investment that occurred at the start of, or throughout the duration of, the equity investment. This understanding of the phrase can account for (1) why redemption claims are not subject to mandatory subordination; (2) the two policy rationales underlying Section 510(b); and (3) the holdings in both *SeaQuest* and *Templeton*.

---

[43]   *SeaQuest*, 579 F.3d at 421.

This understanding of the phrase first accounts for why redemption claims are not subject to mandatory subordination. A person asserting a redemption claim is not attempting to recover a portion of its equity investment because it is asserting a claim only for the value of the investment at the time of redemption, subject to all losses that may have occurred during the period of investment. In contrast, a person asserting a rescission claim *is* attempting to recover a portion of its equity investment because it is asserting a claim for the amount of its original investment irrespective of any loss that occurred when it became, or while it was, an equity owner. Similarly, a person asserting a claim for damages due to the entity's pre- or post-issuance fraud is attempting to recover a portion of its equity investment because its investment suffered a loss in value due to the entity's fraud and the person is asserting a claim for the amount of value lost.

Second, this understanding accounts for the two policy rationales underlying Section 510(b), namely that (1) equity owners have bargained for unlimited growth potential in exchange for potential loss of the investment in contrast to creditors who have bargained only for the repayment of a fixed debt and (2) the equity owners' risk of losing their investments creates an equity cushion that creditors rely on when they choose to extend credit. When a claimant is attempting to obtain amounts that it lost at the time it became an equity owner or during the period of time it was an equity owner, the claimant is retroactively changing the bargain it

made. The claimant experienced the potential for unlimited growth during the period of investment, but actually incurred loss. By retroactively seeking to obtain the amount lost, the claimant seeks to change its bargain because that bargain turned out badly. In contrast, when a claimant seeks to obtain the value of its equity interest subject to any loss that has already been incurred, as in a redemption, the claimant has lived up to its bargain throughout the period of investment. It is converting the bargain only on a going-forward basis, only by giving up its potential for unlimited growth, and only to the extent that the terms of its agreement with the entity permit. Additionally, as illustrated and explained in the previous section, a claimant's equity investment actually serves its function as an equity cushion when the claimant seeks to obtain the value of its equity interest subject to loss already incurred, but not when the claimant seeks to obtain the amounts lost during the period of investment.

Third, this understanding accounts for the holdings, examples, and hypotheticals in the two main Fifth Circuit cases interpreting Section 510(b): *SeaQuest* and *Templeton*. The Fifth Circuit did not find that the claimants in the redemption examples in *SeaQuest* sought to recover a portion of their equity investments. It also noted that if the actual claimant in *SeaQuest* had been issued a promissory note only "for the total *value* of its equity stake" then the claim would

have been a redemption like those in the redemption examples.[44] Since the claimants in these examples and hypothetical sought to obtain only the value of their investments at the time of redemption, they would not get to recover any losses that they incurred during the period of investment. In contrast, the actual claim in *SeaQuest* was based on a settlement agreement that provided for the claimant to receive "all of its [contributed] assets."[45] Because the claim provided for the claimant to receive all of its contributed assets, the amount of the claim would have been unaffected by any losses that the investment had incurred. Therefore, the Fifth Circuit appropriately held that the claimant was attempting to recoup an equity investment.[46]

Likewise, the claimant in *Templeton* sought to recover losses he had incurred on his equity investment and the Fifth Circuit found that his claims were attempting to recoup his equity investments.[47] His claims were based on guaranty agreements that he had with the debtor.[48] Just as the settlement agreement in *SeaQuest* provided for the claimant to receive all of its assets contributed to the

---

[44]   *SeaQuest*, 579 F.3d at 424 (emphasis added).

[45]   *Id.* at 424 (brackets in original).

[46]   *Id.*

[47]   *Templeton*, 785 F.3d at 155.

[48]   *Id.* at 154.

---

debtor, the guaranty agreement provided for the debtor in *Templeton* to repay to the claimant the original amount of his equity investment regardless of any loss in the value of the investment.[49] Therefore, *Templeton* also fits the understanding that a claimant is attempting to recover its equity investment when the claimant is seeking to obtain amounts that it lost on its equity investment while it was an equity owner.

In sum, because the Fifth Circuit simultaneously stated (1) that claims for redemption are not subject to mandatory subordination and (2) that the most important policy rationale in determining whether a claim is subject to mandatory subordination is whether the claim seeks to recover a portion of the claimant's equity investment, it cannot be true that a claim seeks to recover a portion of the claimant's equity investment simply because it seeks to obtain whatever the value of the investment was at the time the claimant ceased to be an equity owner, since that is exactly what redemption claimants are attempting to "recover." Although the Fifth Circuit has not expressly defined what it means to attempt to recover an equity investment, the examples, holdings, and policy arguments that it gives in *SeaQuest* and *Templeton* demonstrate that it means attempting to regain a loss in the value of the equity investment, not merely cashing out whatever happens to be

---

[49]   *Id.* at 151.

the value of the equity investment when it terminates, subject to any losses that have already been incurred. To hold otherwise would improperly cause redemption claims to be subject to mandatory subordination.

## D.    The Greens' Claim Is a Redemption Claim

The Trustee himself initially characterized the Greens' claim as a "redemption call" in his Omnibus Objection.[50] He was not wrong. Their claim is a redemption in all economic and material respects. In particular, like the claimants in the redemption cases cited in *SeaQuest*, the Greens "prepetition, were no longer able to participate in the benefits and risks associated with being equity holders of the debtor."[51] Once the Greens notified Garrison in writing that they were withdrawing their partnership interest, by the terms of the Partnership Agreement, they lost all legal right and obligation to participate in Garrison's income, gain, and losses.[52]

In addition, the Greens' capital contribution served its function as an equity cushion for creditors just as much as the capital contributions redeemed in the cited redemption cases. They seek to recover only the value of their investment at the

---

[50]   ROA(I).054 (Omnibus Objection ¶ 7, "Certain Claimants [including the Greens] made *redemption calls* and withdrew from the Partnership between February 2008 and May 22, 2014.")(emphasis added).

[51]   *SeaQuest*, 579 F.3d at 423 (quoting *Cybersight*).

[52]   ROA(I). 259 (Partnership Agreement ¶ 5.5(k)).

time of redemption; in other words, after that investment had been actually subject to the risk of complete loss for the entire duration of the investment. They do not seek to recover any value that their investment lost. Their claim therefore has the same economic substance as the redemption claims that *SeaQuest* discusses, with the same consequences to general unsecured creditors.

### E. The Trustee and Bankruptcy Court Did Not Distinguish the Greens' Claim from a Redemption Claim on Any Meaningful Basis

The Trustee reversed his characterization of the Greens' claim only when the Greens filed their brief and he saw that a redemption would not give him his preferred outcome. Suddenly—even though the Trustee himself first characterized the Greens' claim as a redemption—the Greens' characterization of the claim as a redemption was based on "tenuous analogies" and was an "attempt[] to cloak" the true nature of the claim.[53] If the Trustee once thought that the Greens' claim was a redemption and now he is saying that it isn't, he should have a good reason for changing his mind—

But he doesn't. The Trustee and the Bankruptcy Court both asserted that the Greens are attempting to recover or recoup their equity investment,[54] but neither articulated what exactly it is about the Greens' claim that makes it an attempt to

---

[53]   ROA(I).197, ROA(I)199 (Trustee's Reply to the Greens' Response ¶¶ 21, 27).

[54]   ROA(I).199 (Trustee's Reply to the Greens' Response ¶ 27); ROA(I).306 (Opinion).

recover their equity investment when the claims in the redemption cases clearly are *not* an attempt to recover the claimants' equity investments. They distinguished the Greens' claim from the redemption claims discussed in *SeaQuest* on bases that are not relevant to whether or not a claim is attempting to recover an equity investment and that are not otherwise meaningful. Specifically, the Opinion stated that Garrison had not issued a separate promissory note or documented the Greens' withdrawal right in an independent agreement.[55] These distinctions are not meaningful because they are not based on a rule set forth by the Fifth Circuit or grounded in an actual economic difference between the Greens' claim and the redemption claims in *SeaQuest*. As courts of equity, bankruptcy courts should regard substance over form.[56] Moreover, Section 510(b) itself seeks to elevate substance over form.[57] The Court therefore should not follow rules that elevate form over substance when neither statute nor vertical precedent requires it to.

---

[55] ROA(I).306 (Opinion).

[56] *Pepper v. Litton*, 308 U.S. 295, 304-05 (1939)(Bankruptcy courts have invoked their equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done."); *In re Terry Flores*, 32 B.R. 455, 459 (Bankr. S.D. Tex. 1983)("The Bankruptcy Court, as a Court of Equity, regards substance over form, demands equality of treatment among creditors, and loathes forfeiture.").

[57] *Templeton*, 785 F.3d at 154.

## 1. It Doesn't Matter that Garrison Never Issued a Separate Promissory Note

The Fifth Circuit in *SeaQuest* never stated that a claim could not be a redemption claim unless the debtor issued a separate promissory note documenting the claim. Of the four redemption cases it cited, three involved a separate promissory note. But, in the fourth case, *Cybersight*, the debtor never issued a separate promissory note. Instead, the claimant had obtained a pre-petition judgment against the debtor for the debtor's breach of an agreement to purchase the claimant's equity interest.[58] If the debtor in *Cybersight* never issued a separate promissory note, what was the common feature uniting the *Cybersight* claim with the claims in the other three cases? The Fifth Circuit answered this question with an excerpt from *Cybersight*: "In both instances, the claimants, pre-petition, were no longer able to participate in the benefits and risks associated with being equity holders of the debtors."[59] In short, the answer has nothing to do with the fact that all of the cases happened to involve a separate paper documenting the redemption; instead, the Fifth Circuit properly focused on the legal and economic rights of the claimant against the debtor.

---

[58]   *SeaQuest*, 579 F.3d at 423.

[59]   *Id.*

A rule requiring a promissory note or other separate paper documenting the redemption makes no economic sense and elevates form over substance. If a redemption claim requires a separate paper, then the claimant in *Cybersight* did not have a redemption claim until the moment he obtained judgment, even though the judgment merely enforced the legal and economic rights that the claimant already had against the debtor. To elevate form over substance in this way would allow debtors to pick and choose which redeemers will be treated as redeemers in bankruptcy and which will not. The debtor could prefer certain redeemers over others merely by issuing a promissory note to them, thereby elevating those claims over the claims of redeemers without a promissory note.

Although some courts have seemed to treat the existence of a separate debt note as an essential difference between a redemption claim and a claim that is subject to subordination under Section 510(b),[60] the Court should not follow their example in that regard. It is true that when an investor exchanges an ownership interest for a promissory note, the investor has certainly changed its risk/reward profile from that of an equity holder to that of a debt holder and therefore has a redemption claim. And this is what the Fifth Circuit acknowledged out of the cases

---

[60]   *E.g. Mobile Tool*, 306 B.R. at 782.

involving promissory notes.[61] But the Fifth Circuit did not adopt out of these cases a rule that all redemption claims must involve a separate paper. It focused instead on the claimant's risk/reward profile.[62] Since the Fifth Circuit did not adopt a separate paper rule, the Court is not required to follow this rule. And the Court shouldn't follow it because it elevates form over substance; it is simply a bad rule.

## 2. *It Doesn't Matter that the Greens' Right to Withdraw Was Not "Independent" of the Partnership Agreement*

Likewise, the Fifth Circuit has articulated no requirement that a redemption claim be "independent" of the agreement governing the relationship between the debtor and its equity owners (the "entity agreement").[63] On the contrary, at least three of the four cases that the Fifth Circuit favorably cited as examples of redemption claims involve claims based on the debtor's entity agreement. In *Montgomery Ward*, the redemption claim was based directly on the claimant's exercise of his redemption rights under his stockholders agreement with the debtor.[64] In *Mobile Tool*, the redemption claim was based on the debtor's obligation in its stockholder agreement to repurchase its stock upon notice from the

---

[61]   *SeaQuest*, 579 F.3d at 423.

[62]   *Id.* ("In both [*Mobile Tool* and *Cybersight*], the claimants, pre-petition, were not longer able to participate in the benefits and risks associated with being equity holders of the debtors.").

[63]   ROA(I).306 (Opinion)("A redemption claim…must be independent of the partnership agreement.").

[64]   *Montgomery Ward*, 272 B.R. at 839.

---

stockholders.[65] In *Cybersight*, the redemption claim was based on a provision of the debtor's LLC agreement that obligated the debtor to repurchase the claimant's membership interests.[66]

Although *Templeton v. O'Cheskey (In re Am. Hous. Found.)* was cited to support the existence of a rule requiring a redemption claim to be independent of the entity agreement,[67] it does not at all adopt or imply this rule. In *Templeton*, the claimant, Robert Templeton, purchased partnership interests in a number of limited partnerships formed to develop low-income housing projects. Concurrent with each investment, Templeton entered into a separate guaranty agreement with the debtor, American Housing Foundation ("AHF"). AHF was an affiliate of the limited partnerships and the court treated the entities as one. The guaranty agreements promised that AHF would repay to Templeton the full amount of his investments in the limited partnerships.[68] When AHF later filed bankruptcy, Templeton filed his claim for breach of the guaranty agreements, not for a direct repayment of his equity investments.[69]

---

[65]   *Mobile Tool*, 306 B.R. at 779.

[66]   *Cybersight* at *2 "Pursuant to Section 10.4 of the LLC Agreement, Cybersight was obligated to purchase Mr. Gannon's membership interests.").

[67]   *Templeton*, 785 F.3d 143; ROA(I).306.

[68]   *Templeton*, 785 F.3d at 150.

[69]   *Id.* at 154.

---

Because Templeton's claim was for breach of the guaranty agreements, his claim was for the breach of agreements that were technically separate from the limited partnership agreements. But to be a claim that arises from the purchase or sale of a security under Section 510(b), the claim must have some nexus or causal relationship with the sale of the security.[70] Since the guaranty agreements were technically separate from the entity agreements, it was not clear whether or not they had the necessary nexus or causal relationship with the sale of the limited partnership interests. The Fifth Circuit ultimately held that Templeton's claims could be claims for damages arising from the purchase or sale of a security interest—even though they arose from agreements technically separate from the entity agreements—because the guaranty agreements were intimately intertwined with the limited partnership agreements.[71] The intertwinement of Templeton's guaranty claim with the sale of the limited partnership interests supplied the nexus or causal relationship required by Section 510(b).

Separate agreements are not an issue for the Greens. Unlike Templeton's claim, the Greens' claim arises directly from the entity agreement. There is no need to determine whether or not their claim has a nexus or causal relationship with the

---

[70]   *Id.* at 155.

[71]   *Id.*

---

*In re Garrison Municipal Partners, LP*
Appellant Brief

purchase or sale of the security interest. It does—but no more so than the redemption claims in the *SeaQuest* examples. Just because all claims that arise from the purchase or sale of a security interest must have a nexus or causal relationship with the purchase or sale of the security interest does not mean that all claims that have a nexus or causal relationship with the purchase or sale of a security interest must be claims that arise from the purchase or sale of the security interest.

To be subject to subordination under Section 510(b), claims that have a nexus or causal relationship with the purchase or sale of a security interest must also be attempting to recover a portion of the claimant's equity investment. The Fifth Circuit stated in *SeaQuest*: "For a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. *Further*, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale."[72] Accordingly, in *Templeton*, not only did the claims have a nexus or causal relationship with the purchase or sale of the limited partnership interests, the Fifth

---

[72] *SeaQuest*, 579 F.3d at 421 (emphasis added).

Circuit also found that they functionally sought to recover a portion of Templeton's equity investment.[73]

     *Templeton* therefore holds that when a claimant asserts a claim under an agreement that is separate from the entity agreement, the claim can still be subordinated under Section 510(b) if the two agreements are intimately intertwined because the intertwinement supplies the necessary nexus or causal relationship. But it nowhere holds that all claims that do not come from an independent agreement are subject to subordination. If this were so, *Templeton* would not be consistent with *SeaQuest* because three of the four examples of redemption in *SeaQuest* involve claims that have a nexus or causal relationship to the purchase or sale of their respective security interests. Like the Greens' claim, those redemption claims arose directly from the entity agreement. In order for claims to be subordinated under Section 510(b), not only must the claims have a nexus or causal relationship to the purchase or sale of their respective security interests, they must also seek to recover a portion of the claimants' equity investment. Because the Greens are not seeking to recover any losses they incurred before they converted to a debt position, they are not seeking to recover their equity investment.

---

[73]   *Templeton*, 785 F.3d at 155.

---

*In re Garrison Municipal Partners, LP*
Appellant Brief

Since *Templeton* does not impose an independent agreement rule, the Court is not required to apply one and the Court should not apply one for essentially the same reason it should not apply a separate paper rule. Distinguishing between claims based on an independent agreement and those not based on an independent agreement fails to capture any economic distinction between redemption claims on the one hand and rescission claims or claims for damages equivalent to rescission on the other.[74] Furthermore, such a rule would exclude from redemption status most of the claims that the Fifth Circuit actually identified as redemptions.

### 3.     *The Fact That the Withdrawal Provision Is "Not Self-Executing" Is Either Irrelevant or Not True*

The Bankruptcy Court held that the Greens' notice of withdrawal did not redeem their partnership interest because the notice of withdrawal and the withdrawal provisions of the Partnership Agreement were "not self-executing."[75] The Bankruptcy Court further explained that the Partnership Agreement "required action on the part of the general partner to repay the Greens['] equity interests."[76] But the fact that the general partner had to take some action to repay the Greens'

---

[74]  *See SeaQuest*, 579 F.3d at 422 ("The scope of the rescission and damages categories should be construed consistently.").

[75]  ROA(I).302 (Opinion)("The Court overrules the Greens' objection because the partnership withdrawal provisions are not self-executing."); ROA(I).306 (Opinion)("In this case, the notice of withdrawal was not self-executing.").

[76]  ROA(I).306 (Opinion)("The partnership agreement required action on the part of the general partner to repay the Greens equity interests.").

equity interest cannot be the factor that distinguishes between claims subject to subordination under Section 510(b) and redemption claims. This is because *all* claims that remain unpaid require the debtor to take some action to repay the claim. If there were no actions left to take, the claim would not exist because it would already be paid.

　　　　If, instead, the Bankruptcy Court meant that the general partner still had to take some action in order for the Greens to be legally entitled to payment of their claim, then the contention is simply incorrect. Although it is true that once the Greens notified Garrison of their withdrawal, the Partnership Agreement gave the General Partner a lot of discretion regarding *how* Garrison would pay the Greens the amount owed, that discretion did not include *whether* to pay the amount owed. The General Partner could delay payments to the Greens under certain conditions. For example, the General Partner could delay payment after a withdrawal if paying would have a material adverse impact on Garrison, but it still had to pay in full promptly after completing its financial audit for the fiscal year including the withdrawal date.[77] The General Partner did not have the discretion to direct Garrison not to pay the Greens at all.

---

[77]　ROA(I).257 (Partnership Agreement ¶ 5.5(e)).

Regardless of when and how the Partnership Agreement permitted Garrison to pay the Greens their redemption amount, the Greens established a legal, contractual right to the payment of that amount on December 31, 2013, the last day of the fiscal quarter in which the Greens gave their timely withdrawal notice. Although Garrison did not issue a separate promissory note, the contractual rights that the Greens had against Garrison after December 31, 2013 were no different than if it had. Garrison could have issued a separate promissory note stating that it would pay $1,969,297.65 at 0% interest as soon as practicable, but that payments could be delayed to prevent material adverse impact to Garrison so long as they were not delayed past the 2013 financial audit. But even if it had done so, the Greens' state law right to enforce payment would not have been any different. This is because the Greens could have legally enforced payment of the withdrawal amount without any further action by Garrison once a reasonable time had passed after the financial audit for the 2013 fiscal year even absent a separate promissory note.

When the Fifth Circuit discussed redemption claims, it indicated that the distinguishing characteristic of such claims was that the claimant could no longer participate in the risks and benefits of an equity owner.[78] This is true of the Greens'

---

[78] *SeaQuest*, 579 F.3d at 422-23.

claim. When the Greens gave their withdrawal notice, the Partnership Agreement precluded them from sharing in the income, gains, losses, and other partner rights after the effective date of the withdrawal.[79] Their loss of partner rights was not conditioned on when or how Garrison got around to paying them. Therefore, the discretion given to Garrison regarding when and how to pay the Greens should not affect whether or not the Greens' claim is one for redemption.

**F.    The *TriStar* and *Marine Holdings* Cases Are Not Persuasive**

The Trustee urged the Bankruptcy Court to subordinate the Greens' claim based on two cases that are not binding. The Court should not apply these cases to the Greens' claim because they do not take into account the Fifth Circuit's clearly favorable treatment of redemption claims.

***1.    TriStar Is Not Persuasive Because the Ninth Circuit Subordinates Redemption Claims, but the Fifth Circuit Does Not***

*Pensco Trust Co. v. Tristar Esperanza Props., LLC*[80] was a case decided by the Ninth Circuit. The claim at issue in that case is very similar to the Greens' claim, but the factual similarity actually supports the Greens' argument that their

---

[79]    ROA(I).259 (Partnership Agreement ¶ 5.5(k)).

[80]    *Pensco Trust Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 782 F.3d 492 (9th Cir. 2015).

---

claim is a redemption claim. It is just that the Ninth Circuit has decided to subordinate redemption claims, whereas the Fifth Circuit has decided not to.

In *Tristar*, the Ninth Circuit addressed a claim that was similar in all material aspects to the claims in *MarketXT*, *Cybersight*, and *Mobile Tool*. The Ninth Circuit did not distinguish the *Tristar* claim from the claims in those cases; instead, it rejected the reasoning of those cases entirely.[81] In other words, the Ninth Circuit essentially held that even redemption claims, such as those in *MarketXT*, *Cybersight*, and *Mobile Tool*, should be subordinated under Section 510(b). This is obviously contrary to the position taken by the Fifth Circuit in *SeaQuest*, which cited those cases and their reasoning favorably.

Since the Fifth Circuit agreed with the courts in *MarketXT*, *Cybersight*, and *Mobile Tool* that redemption claims are not subject to subordination, it would not have subordinated the *Tristar* claim, which was similar in all material aspects to the claims in those cases. Likewise, the Greens' claim should not be subordinated in the Fifth Circuit because it is similar in all material aspects both to the claim in *Tristar* and to the claims in *MarketXT*, *Cybersight*, and *Mobile Tool*.[82]

---

[81]    *Id.* at 496.

[82]    The result may be different in the Ninth Circuit.

---

### 2.     *Marine Holdings Is Not Persuasive Because the Claimants Never Argued that Their Claims Were Redemption Claims*

The Trustee also urged the Bankruptcy Court to follow the case of *Official Comm. of Unsecured Creditors v. FLI Deep Marine LLC (In re Deep Marine Holdings, Inc.),* a case decided by the Southern District of Texas Bankruptcy Court.[83] Obviously, the case is not binding on this Court, nor was it binding on the Bankruptcy Court.[84] It also should not persuade the Court to subordinate the Greens' claim because it does not address the argument that the Greens assert: that their claim is not subject to mandatory subordination because it is a redemption claim.

*Marine Holdings* does not contain any reasoning regarding when a claim is or is not a claim for redemption as opposed to another type of claim that would be subject to mandatory subordination. This is because the claimants in *Marine Holdings* did not argue—and Judge Isgur did not consider—whether or not the claims at issue were the same as or equivalent to the redemption claims discussed in *SeaQuest*. Instead, the claimants argued that Section 510(b) applies only to claims arising from the actual purchase or sale of a security in the debtor and

---

[83]    *Official Comm. of Unsecured Creditors v. FLI Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, 2011 WL 160595, 2011 Bankr. LEXIS 579 (Bankr. S.D. Tex. Jan. 19, 2011).

[84]    *Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011)("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

---

cannot apply to any claims arising from the debtor's post-issuance conduct.[85] The court stated that the issue to be decided was "whether § 510(b) includes claims that arise during the course of a claimant's ownership of a security or, instead, whether § 510(b) only encompasses claims for damages incurred through the actual purchase or sale of a security."[86] The court decided that Section 510(b) can include claims predicated on post-issuance conduct.[87]

The Greens do not dispute that Section 510(b) can apply to claims predicated on post-issuance conduct, but they assert that not all claims predicated on post-issuance conduct are subject to Section 510(b). Every redemption claim is, of necessity, predicated on post-issuance conduct. An equity holder cannot possibly redeem its equity interest until after the interest has been issued. In both *Montgomery Ward* and *Mobile Tool*, the redemption claims were based on the claimants' post-issuance exercise of their redemption rights under their respective entity agreements.[88] In *MarketXT*, the redemption claim was based on the claimants' post-issuance liquidation of their equity interests.[89] In *Cybersight*, the

---

[85] *Marine Holdings*, 2011 Bankr. LEXIS 579 at *22.

[86] *Id.* at *14.

[87] *Id.* at *25 (quoting *SeaQuest*, 579 F.3d at 422).

[88] *Montgomery Ward*, 272 B.R. at 839; *Mobile Tool*, 306 B.R. at 779.

[89] *MarketXT*, 361 B.R. at 388.

redemption claim was based the debtor's post-issuance obligation to repurchase the claimant's equity interests.[90] The mere fact that a claim is predicated on post-issuance conduct is not sufficient to subject the claim to mandatory subordination under Section 510(b).

Since *Marine Holdings* is about whether or not Section 510(b) can apply to claims arising from post-issuance conduct, it does not address what characterizes redemption claims or whether redemption claims are subject to mandatory subordination. It does not discuss redemption claims at all. Given its lack of consideration and discussion of this issue, *Marine Holdings* should not persuade the Court to reject the Greens' primary argument: namely, that their claim is a redemption claim and redemption claims are not subject to mandatory subordination.[91]

---

[90]    *Cybersight*, 2004 U.S. Dist. LEXIS 24426 at *2.

[91]    *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1447 (2014)(declining to follow portion of prior case "written without the benefit of full briefing or argument on the issue" and where the court was confronted with "different legal arguments."); *Hohn v. United States*, 524 U.S. 236, 251 (1998)("we have felt less constrained to follow precedent where, as here, the opinion was rendered without full briefing or argument.").

**Conclusion**

For the reasons stated above, the Greens' claim is a claim for the redemption of their equity interest in Garrison and, as a claim for redemption, it is not subject to subordination under Section 510(b). Their claim is not an attempt to recover their equity investment. Like the redemption claimants discussed in *SeaQuest*, they are claiming only the value of their investment at the time that they converted their equity position to a debt position, subject to all of the losses that occurred while they were equity investors. Because the Greens converted their equity position to a debt position before Garrison filed its bankruptcy petition and because their equity investment fully served its function as an equity cushion for creditors throughout the period of investment, subordinating the Greens' claim serves neither of the policy rationales underlying Section 510(b). This is so, even though Garrison never issued a promissory note to the Greens and Garrison was not required to pay the Greens' their withdrawal amount immediately. None of these facts affect the economic substance of the Greens' claim. Therefore, the Greens ask this Court to reverse the Bankruptcy Court's Opinion subordinating the Greens' claim and rule instead that the Greens' claim is not subject to subordination under Section 510(b).

Dated: May 25, 2018

---

Respectfully submitted,

*/s/ Reese Baker*
Reese Baker
Baker & Associates
950 Echo Lane, Ste. 200
Houston, Texas 77024
Telephone: (713) 979-2279
Fax: (713) 869-9100
Email: courtdocs@bakerassociates.net
ATTORNEYS FOR APPELLANTS

## Certificate of Service

I certify that on May 25, 2018, this document was served on the following

through the ECF noticing system:

Christopher Adams
Okin Adams LLP
1113 Vine St., Ste. 201
Houston, Texas 77002
cadams@okinadams.com

*/s/ Reese Baker*
Reese Baker

## Certificate of Compliance with Rule 8015(a)(7)(B)

This brief complies with the type-volume limitation of Federal Rule of

Bankruptcy Procedure 8015(a)(7)(B) because it contains 9040 words.

*/s/ Reese Baker*
Reese Baker