Case No. 4:17-v-03567

In the United States District Court for the Southern
District of Texas, Houston Division

_____

In re Garrison Municipal Partners, L.P., *Debtor*

Don & Kay Green, *Appellants*

_____

On Appeal from the United States Bankruptcy Court
Southern District of Texas, Houston Division

Case No. 14-32867

_____

**APPELLEE BRIEF OF RODNEY D. TOW, CHAPTER 7 TRUSTEE**

_____

DIAMOND MCCARTHY, LLP
Kyung S. Lee (SDOT 862)
State Bar No. 12128400
Charles M. Rubio (SDOT 2108915)
State Bar No. 24083768
Robert J. Shannon (SDOT 3196214)
State Bar No. 24108062
Diamond McCarthy, LLP
909 Fannin Street, 37th Floor
Two Houston Center
Houston, Texas 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5195

COUNSEL TO RODNEY D. TOW, CHAPTER 7 TRUSTEE

# TABLE OF CONTENTS

Background ................................................................................................ 1

Summary of Argument ............................................................................. 5

Argument .................................................................................................. 7

    A.   Section 510(b) Requires Mandatory Subordination
         Of the Greens' Claim ................................................................. 7

        1.   The Claim is for Damages Arising for Breach of Contract .............. 8

        2.   The Claim Arises from the Purchase of Security Interests
            In the Debtor ................................................................... 13

    B.   Subordination of the Greens' Claim Effectuates the
         Purpose of Section 510(b) ........................................................ 19

Conclusion .............................................................................................. 21

Certificate of Service ............................................................................. 23

Certificate of Compliance with Rule 8015(a)(7)(B) ............................. 23

# TABLE OF AUTHORITIES

## Cases

*Am. Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*,
   240 F.3d 823 (9th Cir. 2000) ..................................................................15

*Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*,
   281 F.3d 133 (3rd. Cir. 2002) ........................................................ 11, 13

*Official Committee of Unsecured Creditors v. Fli Deep Marine
   LLC (In re Deep Marine Holdings, Inc.)*,
   2011 WL 160595 (Bankr. S.D. Tex. January 19, 2011) ............................ passim

*Pensco Trust Co. v. Tristar Esperanza Properties, LLC
   (In re Tristar Esperanza Properties, LLC)*,
   782 F.3d 492 (9th Cir. 2015) .......................................................... passim

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
   461 F.3d 251 (2nd Cir. 2006) .................................................................12

*SeaQuest Diving, L.P. v. S&J Diving, Inc. (In re SeaQuest Diving, L.P.)*,
   579 F.3d 411 (5th Cir. 2009) .......................................................... passim

*Templeton v. O'Cheskey (In re Am. Housing Found.)*,
   785 F.3d 143 (5th Cir. 2015) ........................................................ 12, 13, 19

## Statutes

11 U.S.C. § 101(49) ............................................................................13

11 U.S.C. 510(b) ........................................................................ passim

Rodney D. Tow, the chapter 7 trustee (the "Trustee") for the estate of Garrison Municipal Partners L.P. (the "Debtor") respectfully submits this Appellee Brief.

## Background

1.     The Debtor was a pooled investment fund that received $41,143,794.59 in cash investments from 18 limited partner investors (the "Investors"). Charles Monroe Garrison managed the Debtor and represented to the Investors that the Debtor would invest primarily in municipal securities. However, he caused the Debtor to invest in highly speculative securities that were not readily marketable. He also caused the Debtor to "value" these non-marketable securities in its books in amounts that far exceeded the amount paid for such investments. Specifically, the Debtor purchased certain bonds at below par and then would immediately mark them up to par. As a result of Mr. Garrison's use of inflated valuations, the books and records of the Debtor incorrectly showed that its investments were realizing substantial returns, when there was no actual return occurring.

2.     The Investors became limited partners in the Debtor by investing in the Debtor through various subscription agreements. Don and Kay Green (the "Greens"), the appellants, were limited partners in the Debtor.

1

3.      The relationship among the Debtor and the partners of the Debtor is governed by the Debtor's Limited Partnership Agreement (the "LPA").[1]   Article 5.5 of the LPA provides the Investors with the opportunity to voluntarily withdraw their limited partnership interest in the Debtor by means of written notice.[2]

4.      Between September 27, 2012 and November 22, 2013, at least seven Investors gave written notice to the Debtor of their intent to withdraw.[3]  On November 13, 2013, the Greens gave written notice to the Debtor of their intent to withdraw their limited partnership interest in the Debtor.[4]  The Debtor never paid this withdraw request.[5]

5.      On May 22, 2014 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").[6]

6.      On June 12, 2017, the Trustee filed the *Omnibus Objection to Proofs of Claim Filed by Limited Partners of Garrison Municipal Partners, L.P.*  (the

---

[1]     ROA(I).221-273 (LPA).  The Record on Appeal is in two parts. This brief will refer to the main document at Doc. No. 6 in this case as ROA(I) and to the attachment to Doc. No. 6 in this case as ROA(II).

[2]     ROA(I).256.

[3]     ROA(I).275-282.

[4]     ROA(I).305 (Memorandum Opinion and Order).

[5]     *Id.*

[6]     ROA(I).001 (Docket).

"Omnibus Claim Objection"), objecting to 40 proofs of claims filed by the Investors on the grounds that the they are duplicative and that they represent equity interests rather than unsecured claims.[7]   The Trustee requested that the Court subordinate and reclassify the Investors' claims as equity interests pursuant to Section 510(b) of the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532  (as amended, the "Bankruptcy Code").[8]   The Greens' proof of claim is one of the proofs of claim that the Trustee objected to in the Omnibus Claim Objection.[9]

7.    The Trustee reached a compromise with a group of Investors (the "Investor Plaintiffs") and filed a motion to compromise these investors claims (the "Investor Plaintiff Compromise Motion").[10]   Pursuant to the compromise, the Investor Plaintiffs agreed to take a portion of the settlement proceeds paid on account of claims asserted by the Trustee and the Investor Plaintiffs against the Debtor's pre-petition accounting firm, and the Investor Plaintiffs agreed to waive their rights to further distributions from the Debtor's estate.

8.    On November 16, 2017, the Bankruptcy Court entered an order (the "Investor Plaintiff Compromise Order") approving the Investor Plaintiff Compromise Motion.[11]

---

[7]      ROA(I).052-069 (Omnibus Claim Objection).

[8]      *Id.*

[9]      *Id.*

[10]     ROA(I).086-111 (Investor Plaintiff Compromise Motion).

[11]     ROA(I).020 (Docket No. 294); ROA(I).333-335 (Investor Plaintiff Compromise Order).

9.     On August, 16, 2017, the Trustee filed *Motion to Authorize Interim Distribution* (the "Interim Distribution Motion").[12]   Pursuant to the Interim Distribution Motion, the Trustee requested authority to pay all the allowed unsecured claims in the bankruptcy case in full.[13]   The disputed claims filed by the Investors, including the Greens' claim, were not included in the request.[14]

10.    On November 16, 2017, the Bankruptcy Court entered an order (the "Interim Distributing Order")[15] approving the Interim Distribution Motion.   The Trustee made distributions in accordance with the Interim Distribution Order.

11.    As a result of the Investor Plaintiff Compromise Order and the Interim Distribution Order the only parties that have outstanding claims against the Debtor's estate are the Greens and five other limited partners of the Debtors: Donna Reeder, Marathon Financial Insurance, Company, Jay Steven Adelson, Robert Kevin Rose, and Patricia Thomas (collectively, the "Remaining Claim Holders").[16]

---

[12]     ROA(I).018 (Docket No. 268); ROA(I).122-134 (Interim Distribution Motion).

[13]     ROA(I).122-134 (Interim Distribution Motion).

[14]     *Id*.

[15]     ROA(I).020 (Docket No. 295); ROA(I).336-337 (Interim Distribution Order).

[16]     ROA(I).089, ¶ 14.

12.     On September 7, 2017, the Court held a hearing on the Omnibus Claim Objection (the "Hearing").[17]  At the Hearing, the Court requested additional briefing.[18]

13.     On September 14, 2017, the Greens filed *Don and Kay Green's Brief Regarding Mandatory Subordination under 11 U.S.C. § 510(b)*.[19]

14.     On September 20, 3017, the Trustee filed the *Chapter 7 Trustee's Reply to the Green's Response to Omnibus Objection*.[20]

15.     On October 31, 2017, the Bankruptcy Court entered its Memorandum Opinion and Order (the "Opinion") overruling the Greens' objection to subordination of their claim under Section 510(b) of the Bankruptcy Code.[21]

16.     On November 10, 2017, the Greens filed a notice of appeal of the Opinion.

17.     On May 25, 2018, the Greens filed the Appellant Brief of Don & Kay Green.

### Summary of Argument

18.     All of the Remaining Claim Holders are limited partners of the Debtor.   The Trustee is seeking to conclude the administration of the Debtor's

---

[17]     ROA(I).018-019 (Docket: Courtroom Minutes 9/07/2017).

[18]     *Id.*

[19]     ROA(I).019 (Docket No. 274).

[20]     ROA(I).019 (Docket No. 277).

[21]     ROA(I).302-306 (Opinion).

bankruptcy case by making a pro rata distribution to the Remaining Claim Holders.

19.    The Greens argue that submitting a notice of withdrawal converted their equity claim to an unsecured creditor claim.  However, Section 510(b) of the Bankruptcy Code prevents equity holders from improving their position from an equity holder to a creditor by asserting a claim arising from their investment in the equity.

20.    The Greens try to distinguish their claim as a "redemption" claim.  A redemption occurs when a company gives cash, a promissory note or some other asset in exchange for the equity being redeemed.  While the Greens made a withdraw request, their partnership interests were never redeemed.   A redemption would have required further action by the Debtor to give the Greens something on account of their withdraw request.   Instead, the Green's have a damages claim against the Debtor for breaching the withdrawal provisions of the LPA.    This breach of contract claim arising from the equity security is subject to mandatory subordination under Section 510(b) of the Bankruptcy Code.

21.    The Bankruptcy Court's Opinion subordinating the Greens' claim to the level of equity should be affirmed.  This will allow the Greens and other Remaining Claim Holders to share in the distributions of the Debtor's estate on a

pro rata basis rather than affording the Greens an over-sized distribution at the expense of the other Remaining Claim Holders.

## Argument

22.   Section 510(b) of the Bankruptcy Code requires subordination of claims for damages arising from the purchase of securities.  The Greens' Claim is for damages for breach of the LPA, which arises from their purchase of equity securities in the Debtor.  Section 510(b) of the Bankruptcy Code effectuates the great principles of bankruptcy law which is that creditors should be paid ahead of equity holders.  For the reasons set forth below, the Court should affirm the Bankruptcy Court's opinion that re-characterizes and subordinates the Greens' claim to the level of equity.

**A.   Section 510(b) Requires Mandatory Subordination of the Greens' Claim**

23.   Section 510(b) of the Code provides that:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase of sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

24.   The Greens' claim falls squarely within the scope of 510(b) as intended by Congress and as interpreted by circuit courts, including the Fifth Circuit, for two reasons.  First, the Claim is a claim for breach of contract

damages arising from the Debtor's breach of the LPA.  Second, the Claim arises

from the purchase and sale of a security interest in the Debtor.

### 1.    The Claim is for Damages Arising for Breach of Contract

25.    The Greens' claim seeks damages for injuries resulting from breach

of contract under the LPA.[22]   The Greens sought to withdraw their equity

investment in the Debtor, pursuant to the voluntary withdrawal provisions of the

LPA.[23]  These provisions provide in relevant part:[24]

5.5 Withdrawal of Interests of Partners

(a) The Interest of a Partner may not be withdrawn from the
Partnership prior to its dissolution except as provided in this Section
5.5.

(b) Except as provided in Section 5.5(m), Section 6.1(c) and this
Section 5.5(b), and subject to any arrangements with Special Limited
Partners, a Limited Partner may voluntarily withdraw all or part of his
Limited Partner Interest in the Partnership as of the close of business
on the last day of each Fiscal Quarter (or at such other times as the
General Partner, in its sole discretion, may determine); provided that
as of such withdrawal date, such Limited Partner has held a Limited
Partner Interest for at least twelve (12) complete, consecutive calendar
months; and provided, further, however, that if withdrawal requests
are received as of the close of any Fiscal Quarter for more than 20%
of the Regular Account Net Assets as of such Fiscal Quarter end, the
General Partner may, in its discretion, reduce al1 withdrawal requests
pro rata so that only 20% of the value of the Regular Account Net
Assets as of such Fiscal Quarter end is withdrawn.  A withdrawal
request that is not satisfied as of the intended Fiscal Quarter end
because of the foregoing restrictions will be satisfied as of the next

---

[22]    ROA(I).215-216.

[23]    ROA(I).215-216.

[24]    ROA(I).256-259.

Fiscal Quarter end; provided, that, such restrictions do not apply as of such time. Such withdrawal requests will be satisfied in preference to later withdrawal requests subject to the foregoing provisions. Capital not withdrawn from the Partnership by virtue of the foregoing restrictions will remain at the risk of the Partnership until the effective withdrawal date. Such Limited Partner must give irrevocable written notice to the General Partner at the principal office of the Partnership at least forty-five (45) days prior to the proposed withdrawal date (or within such other time as the General Partner, in its sole discretion, determines) indicating the amount to be withdrawn from such Partner's Capital Account in such notice. The General Partner may, in its sole discretion, waive the foregoing notice requirement.

\* \* \*

(e) The General Partner, in its sole discretion, may effect withdrawal payments (I) in cash, (ii) by transfer to the Limited Partner of certain portfolio Securities or other assets of the Partnership, whether or not readily marketable, the fair market value of which would satisfy the Limited Partner's request for withdrawal or (iii) in any combination of the foregoing. Except as provided in Sections 5.5(g) and 5.5(j), payment of at least ninety percent (90%) of the estimated amount due to a withdrawing Partner must be made as soon as practicable (but not more than ten (10) Business Days) after the effective date of withdrawal, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership. Any remaining balance must be paid, without interest thereon, promptly following completion of the audit of the Partnership's financial statements for the Fiscal Year that includes the effective date of withdrawal. The capital to be withdrawn will not participate in new Special Situation Investments made after the relevant withdrawal date. A request for a partial withdrawal is charged to a Limited Partner's Capital Account attributable to the Regular Account to the extent thereof unless otherwise agreed with the General Partner.

\* \* \*

(g) Upon receipt by the General Partner of a Limited Partner's notice of intention to withdraw assets from the Partnership, the General

Partner has the absolute discretion to manage the Partnership's assets in a manner which would provide for cash being available to satisfy such Limited Partner's request for withdrawal, but the General Partner is under no obligation to effect sales of Partnership assets if the General Partner. in its sole discretion, determines that such transactions might be detrimental to the interest of the other Partners or that such transactions are not reasonably practicable. ln the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Regular Account, no settlements may occur with respect to any of such Limited Partner's Special Situation Investment Sub-accounts until the occurrence of a Recognition Event with respect to any such Special Situation Investment after the scheduled payment date for the withdrawal.  If the Recognition Event is a sale for cash, the settlement is funded in cash within 90 days after the Recognition Event (without interest).  If the Recognition Event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant Security or by distributing the net proceeds derived from a sale of such Securities or other available cash. ln connection with any such settlement, a calculation of the Limited Partner's Performance Change through the date of the Recognition Event is made to determine whether any Performance Allocation is to be credited to the General Partner. The General Partner is entitled to withdraw an amount equal to any such Performance Allocation, together with any Management Fees deferred pursuant to Section 3.7(a), at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

* * *

(k) A withdrawing Partner does not share in the income, gains and losses of the Partnership or have any other rights as a Partner after the effective date of its withdrawal except as provided in Section 3.8.

26.    The Debtor failed to comply with this withdraw request by the December 31, 2013 withdrawal date.[25]

---

[25]      ROA(I).215-216.

10

27.     Several months following with withdraw request, the Debtors filed for bankruptcy.

28.     For the purposes of "damages," the majority of courts confronting subordination cases have read Section 510(b) broadly, encompassing a variety of claims, including breach of contract. *SeaQuest Diving, L.P. v. S&J Diving, Inc. (In re SeaQuest Diving, L.P.)*, 579 F.3d 411, 421 (5th Cir. 2009)(stating that a claim arising from the purchase or sale of a security can include claims based on post-issuance breach of contract); *Official Committee of Unsecured Creditors v. Fli Deep Marine LLC (In re Deep Marine Holdings, Inc.)*, 2011 WL 160595, at *7 (Bankr. S.D. Tex. January 19, 2011)(stating that the policies underlying Section 510(b) support a broad construction of its scope); *Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 142 (3rd. Cir. 2002)(reasoning that Section 510(b) prevents claimants from using breach of contract claims to recover the value of their equity investment in parity with general unsecured creditors); *Pensco Trust Co. v. Tristar Esperanza Properties, LLC (In re Tristar Esperanza Properties, LLC)*, 782 F.3d 492, 495 (9th Cir. 2015) (holding that for 510(b) purposes a claim that an LLC failed to pay an amount due under the operating agreement for the repurchase of membership interests was a breach of contract claim).  As noted by the Fifth Circuit, "the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim

predicated on post-issuance conduct — *i.e.*, conduct after the issuance of the security — such as breach of contract." *Templeton v. O'Cheskey (In re Am. Housing Found.)*, 785 F.3d 143, 154 (5th Cir. 2015).

29.     The Greens' claim is that the Debtor failed to pay them the amount due under the LPA as a result of their voluntary withdrawal.  This is a claim for the Debtor's breach of contract that arises from the purchase of a security of the Debtor and must be subordinated pursuant to Section 510(b).  *See In re Tristar*, 782 F.3d at 495, 497 (holding that (i) for the purposes of Section 510(b), an investor's claim that an LLC failed to pay her the amount she was due under the operating agreement for the purchase of her membership interest was a breach of contract claim and (ii) that it should be subordinated under the statute).

30.     The Greens have attempted to cloak their Claim as a redemption claim in order to avoid Section 510(b) mandatory subordination and to recoup their equity investment.  The Court should immediately view the Greens' position with mistrust.   As other courts have noted, "[w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion." *Rombro v. Dufrayne (In re Med. Diversified, Inc.)*, 461 F.3d 251, 258 (2nd Cir. 2006).   Additionally, the Fifth Circuit is clear on this point: the fact that the Greens are "effectively attempting to

recoup [their] equity investments in the [Debtor] through [the Claim] supports the application of Section 510(b) here." *In re Am. Housing Found.*, 785 F.3d at 155; *see also In re Telegroup*, 281 F.3d at 142 (stating that in the 510(b) analysis, more important than the timing of actionable conduct is the fact that a claim seeks to recover a claimant's equity investment).

### 2.   The Claim Arises from the Purchase of Security Interests in the Debtor

31.   In this case, it is clear that the Claim arises from the purchase of a security within the meaning of Section 510(b).[26]

32.   Recognizing that the term "arising from" is ambiguous, the Fifth Circuit and other courts have turned the legislative history of Section 510(b).  The courts have determined that "for a claim to 'arise from' the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale." *In re SeaQuest*, 579 F.3d at 421 (citing *In re Telegroup*, 281 F.3d at 138).  In terms of policy considerations, "the fact that the claims in the case seek to recover a portion of the claimant's equity investment is the most important policy rationale."  *Id.* (stating that when an investor seeks *pari passu* treatment with creditors, he disregards the absolute priority rule and attempts to establish a contrary principle that threatens to swallow this fundamental rule of bankruptcy).

---

[26]   The Bankruptcy Code expressly defines the term "security" to "include [an] interest of a limited partner in a limited partnership."  11 U.S.C. § 101(49)(A)(xiii).

33.     Therefore, the crucial question for the Court is to determine how the claim arises and whether there is a causal nexus between the claim and the purchase of the security.  *See In re Tristar Experanza*, 782 F.3d at 497; *see also In re SeaQuest*, 579 F.3d at 421.

34.     In *In re Deep Marine Holdings*, investors brought a pre-petition suit against a company for confiscating their shares in a short-form merger, and subsequent to the bankruptcy petition, filed proofs of claim.  2011 WL 160595, at *1.    In that case, the bankruptcy court was confronted with deciding whether Section 510(b) applies to claims that arise during the course of a claimant's ownership of a security or, instead, whether Section 510(b) only encompasses claims for damages incurred through the actual purchase or sale of a security.  *Id*. at 4.

35.     The court noted that the purpose of Section 510(b) is to "prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."  *Id*. at 6 (quoting *In re Telegraph*, 281 F.3d at 142).   The court then stated that "there is no reason to use the time in which security-holders' claims arise as a basis for treating security-holders' claims differently in a bankruptcy proceeding."   *Id*. (observing that the purpose of Section 510(b) is to prevent shareholders from receiving equal treatment with

unsecured creditors); *see also Am. Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829 (9th Cir. 2000)(stating that nothing in Section 510(b) requires a subordinated claimant to be a shareholder). Based on this reasoning and the policy purposes of Section 510(b), the court held that the investor's claims were causally linked to their status as shareholders and that mandatory subordination was required. *Id*. at 7.

36.    The Ninth Circuit's holding in *In re Tristar* is also factually similar and instructive to the case at hand. In *In re Tristar*, an LLC investor exercised her right to voluntarily withdraw from the company. 782 F.3d at 494. After a dispute between the investor and the LLC regarding the valuation of the investor's interest, the investor obtained an arbitration award and state-court judgment. *Id*. The company then filed for bankruptcy and the investor filed a proof of claim, which the company sought to subordinate under Section 510(b) of the Bankruptcy Code. *Id*. The Ninth Circuit held that the investor's claim was subject to mandatory subordination.

37.    The investor first argued that her claim was not for damages, but for a fixed debt. *Id*. at 495. The Ninth Circuit disagreed, holding that the investor's claim that the company failed to pay her for the purchase of her membership in accordance with the operating agreement interest was a breach of contract damages claim. *Id*. at 495.

15

38.     Next, similar to the Greens' claim, the *Tristar* investor argued that her claim did not arise from the purchase or sale of a security because her equity claim was converted into a debt claim prior to the bankruptcy petition. *Id*. at 496. Observing that the investor had exercised her right to withdraw from the LLC, the Ninth Circuit nonetheless categorically disagreed with this argument. *Id*. The court noted that although the investor did not enjoy the benefits of equity ownership on the petition date, she bargained for an equity position and thus embraced the risks of that position. *Id*. The Ninth Circuit reasoned that the critical question for the purposes of 510(b), as clearly shown in the statutory text, "is not whether the claim is debt or equity at the time of the petition, but rather whether the claim *arises from* the purchase or sale of a security." *Id*. 497 (noting that although the investor was a creditor on the petition date, the status of the claim on the petition date does not end the 510(b) inquiry). Because the investor's claim arose from the failed sale of her membership interest and the LLC's breach of the operating agreement's provisions regarding repurchase of membership interests, the Ninth Circuit had "no doubt as to whether her claim for damages '[flowed] from' the purchase or sale of a security of the debtor" and upheld the subordination of the investor's claim. *Id*. at 498.

39.     Based on this case law, it is evident that the Greens' claim arises from their purchase of an ownership interest in the Debtor. The Greens' claim

16

makes clear that their asserted right to payment relates directly to their purchase of equity interests in the Debtor.[27]   The Greens' claim arises from the failed withdrawal of their ownership interest in the Debtor, and the Debtor's breach of the LPA regarding satisfaction of that withdrawal.[28]   The LPA was only applicable because of the Greens' previous purchase of an equity security in the Debtor. There is no reason to use the time in which the Greens' claim arose as a basis for treating them differently from any of the other Investors.   *See In re Deep Marine Holdings*, 2011 WL 160595 at *6.

40.    In the Opinion, the bankruptcy court found that the provisions in the LPA are not self-executing and that the LPA required action on the part of the general partner of the Debtor to repay the Greens.[29]   The bankruptcy court also found that the Debtor never repaid the Greens.[30]   The bankruptcy court concluded that the Debtor's failure to pay the Greens' claim upon withdrawal is a claim for breach of contract arising from the withdrawal.[31]

41.    The bankruptcy court distinguished this breach of contract claim from the redemption situation described in *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836 (Bankr. D. Del.

---

[27]        ROA(I).215-216.

[28]        ROA(I).215-216.

[29]        ROA(I).302.

[30]        ROA(I).302.

[31]        ROA(I).306.

2001), *abrogated on other grounds by In re Telegroup, Inc.,* 281 F.3d 133 (3d Cir. 2002).  Prior to its bankruptcy filing, Montgomery Ward redeemed stock held by a former employee by paying cash and giving a promissory note.   After the bankruptcy filing, the chapter 11 debtors brought an action against the former employee to subordinate the employee's promissory note claim under Section 510(b) of the Bankruptcy Code. The Delaware court held that a claim based on a promissory note is not subject to subordination under Section 510(b). *Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward Holding Corp.)*, 272 B.R. 836, 844–45 (Bankr. D. Del. 2001).   The fundamental concept underlying the Delaware court's decision is that the "Defendants did exchange their stock for a debt instrument."  *Official Committee of Unsecured Creditors v. Am. Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778, 781 (Bankr. D. Del. 2004).  The Delaware court distinguished the facts in *In re Mobile Tool* and *In re Montgomery Ward* from other cases considering section 510(b) specifically on the basis that the other cases "involved neither a separate promissory note nor a debt instrument."  *Id.*

42.     Similarly, in its discussion of *In re Montgomery Ward* and *In re Mobile Tool*, the Fifth Circuit clearly pointed out that the Delaware court's basis for holding that the equity claimant's position changed is that the claimants exchanged stock for a promissory note.  *In re SeaQuest*, 579 F.3d at 423.  In this

case, the Debtor never provided the Greens' with a promissory note, debt instrument, or any other promise to repay.  The withdraw provisions are not self-executing.   The withdrawal required the Debtor's general partner to take action which was not taken.   As a result, the Greens' claim arises from Debtor's breach of the LPA regarding satisfaction of the Greens' withdrawal request.

43.     As in *In re Tristar*, the direct causal link between the Greens' claim and their ownership of an equity interest in the Debtor clearly shows that their claim arises from the purchase of a security of the Debtor.  *See*, 782 F.3d at 498. The Greens' claim could not have arose but for their previous purchase of equity securities in the Debtor. The Greens' assertion that they are entitled to treatment as general unsecured creditors "is exactly the elevation of form over substance that Section 510(b) seeks to avoid—by subordinating claims that functionally seek to 'recover a portion of claimants' equity investment[s].'"  *In re Am. Housing Found.*, 785 F.3d at 154 (quoting *In re SeaQuest*, 579 F.3d at 421).

**B.     Subordination of the Greens' Claim Effectuates the Purpose of Section 510(b)**

44.     The re-characterization and mandatory subordination of the Greens' claim is consistent with Congress' goals in enacting Section 510(b) of the Bankruptcy Code, which "serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *SeaQuest*, 579 F.3d at 417.

45.     Congress drew inspiration for 510(b) from an article authored by Professors John Slain and Homer Kripke in 1973 regarding the allocation of risk between investors and creditors.  *In re Deep Marine Holdings*, 2011 WL 160595 at *5.  According to Slain and Kripke, the risk of illegality in the issuance of securities should be borne by investors.  *Id*. at 6.  The basis for this premise is that "it would be improper to reallocate this risk to creditors who (1) never bargained for an equity position in the debtor and (2) extended credit to the debtor in reliance on the equity cushion provided by the investors."  *In re SeaQuest,* 579 F.3d at 420.

46.     In enacting Section 510(b), Congress intended to "prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."  *In re Deep Marine Holdings*, 2011 WL 160595 at *6.  Otherwise, investors would unfairly be given a claim to the upside if the company prospers and participation with creditors if the company fails.  *Id*.  As a result, Section 510(b) binds a claimant to their decision to take an equity stake in the debtor.  *Id*.

47.     The fact that the Greens seek to recover a portion of their equity investment is the most important policy consideration for the Court.  *Id*. at 7.  In attempting to obtain *pari passu* treatment with the Debtor's creditors, the Greens

disregard the absolutely priority rule and attempt to establish a contrary principle to the fundamental rule of bankruptcy law that creditors should be paid ahead of shareholders. *Id.*

## Conclusion

48.     The Green's claim against the Debtor is based on the Debtor's breach of its obligation to redeem the Green's partnership interest.   This is a claim for damages arising from the equity security of the Debtor.  This is precisely the type of claim covered by Section 510(b) of the Bankruptcy Code to prevent equity holders from attempting to elevate their status from an equity holder to a creditor.

49.     The Trustee respectfully requests this Court affirm the Bankruptcy Court's opinion providing for the equitable subordination of the Greens' claim pursuant to Section 510(b) of the Bankruptcy Code.

DATED: June 25, 2018                     Respectfully submitted,

DIAMOND MCCARTHY, LLP

*/s/ Robert J. Shannon*
Kyung S. Lee (SDOT 862)
State Bar No. 12128400
Charles M. Rubio (SDOT 2108915)
State Bar No. 24083768
Robert J. Shannon (SDOT 3196214)
State Bar No. 24108062
Diamond McCarthy, LLP
909 Fannin Street, 37th Floor
Two Houston Center
Houston, Texas 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5199

GENERAL COUNSEL TO
RODNEY D. TOW, TRUSTEE

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2018, this document was served the court's

CM/ECF noticing system to counsel for the Appellants as follows:

Reese Baker
Baker & Associates
950 Echo Lane, Suite 200
Houston, Texas 77024
Email:  courtdocs@bakerassociates.net


   _/s/ Charles M. Rubio_____




## **CERTIFICATE OF COMPLIANT WITH RULE 8015(a)(7)(B)**

This brief complies with the type-volume limitation of Federal Rule of

Bankruptcy Procedure 8015(a)(7)(B) because it contains 4,887 words.


   _/s/ Charles M. Rubio_____